**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Thomas Woodland,

Plaintiff,

v.

Joseph T. Ryerson & Son, Inc.,

Defendant.

Civil No. 00-1492 (DWF/AJB)

**MEMORANDUM OPINION AND ORDER**

---

Christopher Walsh, Esq., Walsh Law Office, 301 Fourth Avenue South, Suite 270, Minneapolis, MN 55415, appeared on behalf of Plaintiff.

Jean Holloway, Esq., Matthew Klein, Esq., and Martine Daniel, Dorsey & Whitney, Pillsbury Center South, 220 South Sixth Street, Minneapolis, MN 55402, appeared on behalf of Defendant.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on July 19, 2001, pursuant to Defendant's Motion for Summary Judgment. In the Complaint, Plaintiff alleges that Defendant violated state and federal law by engaging in age and race discrimination, by permitting a racially hostile work environment, and by retaliating against Plaintiff for defending his rights. For the reasons set forth below, Defendant's motion is granted.

## Background

Defendant Joseph T. Ryerson & Son, Inc. ("Ryerson") operates a steel supply and processing facility in Plymouth, Minnesota. In 1988, Plaintiff Thomas Woodland ("Woodland"), a 45-year-old African-American man with 20 years of experience in the steel industry, submitted an employment application with Ryerson. Ryerson told Woodland that it was not hiring at that time.

FILED JUL 25 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD JUL 25 2001
DEPUTY CLERK

In 1989, Ryerson was audited by the U.S. Office of Federal Contract Compliance ("OFCCP"). The OFCCP concluded that Ryerson had not taken adequate measures to attract, recruit, and hire minority employees. Ryerson and OFCCP entered into a conciliation agreement which required Ryerson to increase efforts to recruit and hire minority personnel. In response to that conciliation agreement, Ryerson invited Woodland to reapply. Woodland was subsequently hired and began work in February of 1990.

Between the time Woodland first applied and the time that Ryerson actually hired Woodland, Ryerson hired approximately four other employees, including Loren Halvorson. These employees were considered to have more seniority than Woodland because they were hired before Woodland.

In September of 1994, Ryerson posted an opening for a "laser operator." Woodland bid on the position. Loren Halvorson also bid on the position and was awarded the position because he had more seniority. Deposition of Thomas Woodland ("Woodland Depo.") at 53. As Woodland notes, if Ryerson had hired Woodland the first time he applied, Woodland would have had more seniority than Halvorson.[1] However, Woodland does not contend that he was otherwise more qualified than Halvorson for the laser operator position. Woodland Depo. at 362 ("We were both in the same situation. Neither one of us had ran [sic] that machine before. The hiring is the whole problem here."). Woodland also contends that there were numerous instances in which he lost bids for overtime work to people with more seniority who were hired between

---

[1] Woodland also references a number of other "missed" opportunities for promotion to other jobs with Ryerson. In all of these other cases, however, Woodland either voluntarily pulled his bid before an award was made, failed to bid at all, or lost the bid to someone who would have had more seniority even if Ryerson had hired Woodland in 1988. Woodland Depo. at 49-51, 56, 57.

1988 and 1990. Woodland Depo. at 74-77. Finally, Woodland contends that he was laid off on two occasions and that he would not have been subject to lay-off if he had been hired in 1988.

With respect to the overall racial climate at Ryerson, Woodland recounts the following instances of racial hostility. First, on three separate occasions, Woodland heard from other employees that a Ryerson employee had used a racial epithet to refer to Woodland. On two of those occasions, Woodland chose to ignore the allegations and did not report the incidents. Woodland Depo. at 118, 126. On the third occasion, Woodland did report the incident to a supervisor; the supervisor offered to fire the offending employee, but Woodland said he would rather forget about it. Woodland contends that Ryerson handled this situation appropriately. Woodland Depo. at 106-107 ("Q. Do you think the company handled that appropriately? A. They did because they came to me and asked me what way should they go with it.").

Second, and similarly, Woodland alleges that, on one occasion, he instructed another employee to report the use of racial slurs by a third employee. Woodland has testified that Ryerson gave the offending employee an ultimatum–to cease using such language or face termination. Woodland testified that he felt Ryerson handled the situation appropriately. Woodland Depo. at 117 ("A. I heard no more about it. Q. It seemed like the company handled that properly? A. I can only assume they did.").

Third, Woodland alleges that another employee made an obscene gesture towards Woodland.[2] A supervisor witnessed the incident and offered to fire the offending employee if

---

[2] At one point, Woodland characterizes the action as "masturbation"; however, elsewhere in his deposition Woodland describes the event in more detail, and it appears that the employee remained fully clothed and made a sexual gesture.

Woodland would sign a complaint. Woodland declined because he did not want someone to lose their job over something "stupid." Woodland Depo. at 129.

Fourth, Woodland cites several instances of racist graffiti (a hooded figure, "KKK," and a swastika) in the men's restroom at Ryerson. According to Woodland's own testimony, the graffiti was painted over, management called a meeting to indicate that such behavior would not be tolerated, a notice was posted indicating that such behavior could lead to termination, and the behavior stopped. As Woodland testified, "To my knowledge, things looked pretty decent out there then. I know that was because of the warning on that wall brought to somebody's attention that if you're caught doing it, this is what can happen." Woodland Depo. at 144.

Finally, Woodland recounts one instance in which some sort of racist/sexist/homophobic "poem" was circulating, with a great many copies lying about the workplace. Management was walking around collecting them and throwing them away, and no one knew who the perpetrator was. There is no allegation that the poem remained in the workplace for an extended period of time or that management in any way condoned its presence.

Woodland also recounts instances of disparate treatment of minority and white employees. First, Woodland alleges that the drug testing policy and substance abuse policy are applied in a disparate manner. However, Woodland cites only two instances where he himself was drug tested, both following on-the-job injuries; in both of those cases, Woodland himself insisted on being drug-tested pursuant to company policy. Woodland Depo. at 201-202 ("I had to tell him [the doctor] myself when I went over there, he says you can go back to work, I said, no, I've got to have a urine test and blood sample and then you can send it back and let them know whether or not I can go back to work. . . . I had to literally tell the guy [the doctor] you got to give me a test, man, I cut my finger and got stitches in it. No, we don't have to do that, you

can go back to work. No, I can't do that until I get that test result."). Indeed, with respect to Woodland's allegations of disparate discipline, Woodland notes that he has never been disciplined by Ryerson at all, much less in a discriminatorily harsh manner. Woodland Depo. at 157 ("Q. Have you ever been disciplined by the company? A. No, I've got a pretty perfect record.").

Finally, Woodland contends that Ryerson supervisors selectively enforce safety regulations, forcing minority employees to wear helmets and safety glasses while not stringently enforcing those rules against white employees. Specifically, according to Woodland, supervisors routinely tell all employees–black and white–to wear their helmets and safety glasses, but the white employees on the first shift and one white employee on the second shift routinely disregard these admonitions. Woodland Depo. 194-200. Woodland does not contend that Ryerson supervisors have imposed disproportionately harsh sanctions on black employees who do not wear safety equipment or that Ryerson supervisors have imposed disproportionately harsh sanctions on black employees who ignore warnings. Rather, Woodland contends that the supervisors issue the warnings, the black employees heed the warnings, and the white employees ignore the warnings.

Woodland went to management on several occasions to complain about the lingering effects of Ryerson's failure to hire him the first time he applied. In October of 1998, Ryerson–through John Rich–offered Woodland a settlement which included monetary compensation in return for Woodland separating from Ryerson and releasing all claims against

Ryerson.[3] Woodland took the document to his attorney who advised him against signing it. Woodland declined to sign the agreement.

In September of 1998, John Rich (a supervisor at Ryerson) advanced Woodland $500 because Woodland was suffering financial hardship. Woodland apparently represented that he would repay the advance within a few weeks, but the advance form does not state a repayment schedule. In October of 1999, Rich prepared a memorandum expressing his frustration and disappointment that Woodland had not yet repaid the $500; the memo notes that Woodland had received a signing bonus from Ryerson which would have ostensibly given Woodland the wherewithal to repay the loan. On the advise of Ryerson's human resources department, Rich never sent the memorandum to Woodland. Woodland has yet to repay the $500 advance.

Shortly after Woodland filed this discrimination suit, management moved him from Bay 2 to Bay 6; Woodland would be performing the same job on the same shift, but at a different location within the facility. Woodland did not want to move because he was nervous about the possible health consequences of certain chemicals stored in or near Bay 6. Woodland considers this move to be retaliatory. Management informed Woodland that they were moving him because they needed someone competent on Bay 6 to handle an important client's orders and Woodland was the best man for the job. Woodland even considered the transfer a compliment. Woodland Depo. at 206 ("To be honest with you I appreciate the compliment they gave me.").

---

[3] The Court has reviewed a copy of this proposed agreement, and, apart from the title of the document mentioning "separation," nothing in the agreement indicates that Woodland would cease working for Ryerson if he signed it. Rather, the agreement appears to be more in the nature of a general release than a separation agreement. However, rightly or wrongly, Woodland clearly understood the document to be an agreement to sever the employer/employee relationship.

## Discussion

### 1. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

### 2. Age Discrimination

Woodland claims that Ryerson's failure to hire him in 1988 and his transfer to Bay 6 are evidence of age discrimination. Apart from bald assertions, however, Woodland fails to offer any evidence whatsoever of a causal connection between Woodland's age and these allegedly

adverse employment actions. In the absence of any evidence at all of causation, Woodland fails to make a *prima facie* case of age discrimination.

### 3. Race Discrimination

Woodland's claims of race discrimination premised upon his seniority, his lay-offs, and his inability to bid competitively for jobs and overtime are really all claims based upon Ryerson's allegedly discriminatory failure to hire.[4] As such, those claims are barred by the various applicable statutes of limitations.[5] *See United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977) (flight attendant illegally terminated in 1968 and rehired in 1972 did not allege a continuing violation or new discriminatory action when employer, applying neutral seniority system, failed to reinstate flight attendant's seniority for 1968-1972). Woodland attempts to characterize the lay-offs and bidding problems as a continuing violation, but such a characterization is directly contrary to the law. *See id.* Moreover, Woodland attempts to argue that the statutes of limitations are tolled because Ryerson has a pattern or practice of discrimination; however, Woodland has not offered any evidence of a continuing pattern or practice of discrimination in the hiring process.

---

[4] As Ryerson notes, Woodland does not allege that there is anything inherently discriminatory about the seniority system used by Ryerson, and the only allegation that the seniority system was applied in a discriminatory manner is a bald assertion, entirely unsubstantiated, in Woodland's responsive memorandum. With the exception of this new and unsubstantiated allegation, Woodland's sole contention is that he would have an additional two years of seniority for purposes of bidding, lay-offs, and pension if Ryerson had not unlawfully failed to hire him in 1988.

[5] The appropriate statutes of limitations run from 300 days to six-years. The Court need not expound upon which claims are subject to which statutes of limitations; it is sufficient to note that the outside date for filing any claim at all was in 1995. Woodland did not file a claim with the EEOC until 1999 and did not file this lawsuit until 2000.

To the extent that Woodland alleges that his transfer to Bay 6, the proposed settlement and separation agreement, or John Rich's oral requests that Woodland repay the $500 advance are the results of race discrimination, Woodland fails to state a *prima facie* case. None of these incidents or actions constitutes an adverse employment action. Moreover, with respect to the transfer and John Rich's requests for repayment of the advance, Woodland has offered absolutely no direct or circumstantial evidence from which a fact-finder could infer that these actions were causally related to Woodland's race.

**4. Hostile Work Environment**

To state a claim for hostile work environment, a plaintiff must establish that he was subject to incidents of ridicule, scorn, and/or intimidation which are sufficiently severe and pervasive enough to alter the terms and conditions of the plaintiff's employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). Moreover, "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment . . . ." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). To the extent that a plaintiff alleges a sufficiently hostile work environment, his claim will only stand against his employer if he can demonstrate that his employer knew or should have known of the hostile work environment yet failed to take prompt and effective remedial action. *See Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir. 1999).

To the extent that Woodland alleges that he was subject to a hostile work environment or that he was aware of other employees being subject to such an environment, Woodland generally concedes that he chose not to report the offensive conduct or that Ryerson dealt with the offensive conduct in an appropriate manner. On those occasions when an employee used a racial epithet to refer to Woodland, either Woodland declined to report the incident or he felt that

Ryerson acted appropriately. On those occasions when racist graffiti or offensive documents were circulated at Ryerson, Woodland concedes that Ryerson removed the offensive materials, made it clear that such behavior was inappropriate, and the conduct ceased. The record simply does not support an allegation that Ryerson allowed Woodland to endure a severely hostile work environment.

Woodland has offered evidence which he alleges shows that Ryerson disparately applied its drug and alcohol policies and disparately punished other employee misconduct. That evidence is relevant for fairly limited purposes: it may be relevant if that conduct actually affected Woodland's well-being or to demonstrate the employer's intent to discriminate or as evidence of pretext. *See Madison v. IBP, Inc.*, ___ F.3d ___, 2001 WL 704432 (8th Cir. 2001). That evidence cannot be used, however, to bootstrap Woodland's own claims; Woodland may only bring an action for the hostile work environment he himself endured. *Id.* Here there is no question that the disparate treatment described had no effect on Woodland, himself; Woodland was only tested for drugs when *he* insisted on it and he has never been disciplined for misconduct. Moreover, there are no remaining ambiguous actions by Ryerson on which this evidence can cast the shadow of discriminatory intent.

In short, Woodland has failed to provide sufficient evidence from which a reasonable fact-finder could conclude that Woodland endured severe and pervasive racial hostility, that Ryerson knew or should have known of such hostility, and that Ryerson did nothing about it. Accordingly, Ryerson is entitled to summary judgment.

**5. Retaliation**

"To present a prima facie case of retaliation, a plaintiff must show that he engaged in protected conduct, that he suffered an adverse employment action, and that the adverse

employment action was causally linked to the protected conduct." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999). Woodland's claims for retaliation fail because he has failed to identify any adverse employment action taken against him as a result of his protected conduct. Woodland alleges that his transfer to Bay 6, Ryerson's offer of settlement/separation agreement, and John Rich's requests that Woodland repay the $500 advance are all incidents of retaliation. As noted above, none of these actions constitutes an adverse employment action by Ryerson. As Woodland himself concedes, the transfer to Bay 6 was, in essence, a compliment; Woodland would have preferred to remain in Bay 2, but the transfer to Bay 6 did not cause a "materially significant disadvantage" to Woodland. *See Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994). The settlement agreement was an alternative offered to Woodland, but there were no repercussions to him not accepting that alternative. Finally, John Rich's verbal requests that Woodland repay the $500 did not disadvantage Woodland in his job; there is no allegation that Rich was abusive or insulting in his requests, and there is no evidence that Ryerson attempted to coerce Woodland to pay his debt.[6]

**6. Discovery**

Woodland finally claims that the Court should not grant summary judgment in this matter because Ryerson has not been entirely forthcoming with discovery. However, the period for discovery ended on April 1, 2001; Woodland never brought a motion to compel discovery; and

---

[6] Woodland places a great deal of emphasis on the memo prepared by John Rich in October of 1999. As Woodland notes, John Rich did not send the memo because human resources advised him that, in light of Woodland's discrimination claim, the letter might appear retaliatory. Woodland holds up this admission as a sort of smoking gun. However, the admission is no such thing. First, something that might appear retaliatory is not necessarily *actually* retaliatory. Second, and more importantly, Rich never sent Woodland the memo; even if the action might have been retaliatory, the action never happened.

Woodland has not sought an extension of the discovery period. If Ryerson inappropriately withheld discovery (and the Court does not concede this to be the case), Woodland failed to remedy the situation in an appropriate and timely manner. It is too late now for Woodland to assert that there is outstanding discovery which might alter the landscape of this litigation.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. No. 10) is **GRANTED** and the **COMPLAINT** is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 24th, 2001

DONOVAN W. FRANK
Judge of United States District Court

JUL 25 2001

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# Please forward this announcement to the recipient of this fax.

---

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

## For additional information on either program please visit our website at www.mnd.uscourts.gov.

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500